IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

JACKIE SCOTT                                                      PLAINTIFF

V.                                                           NO. 3:13-CV-00168-DMB-JMV

CORRECTIONS CORPORATION OF
AMERICA; TALLAHATCHIE COUNTY
CORRECTIONAL FACILITY; BOBBIE
PHILLIPS; J. WARDLOW;
CHARLOTTE BURNS; MIRANDA
RANKIN; and GINA ROBINSON                                DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This employment discrimination action is brought by Plaintiff Jackie Scott against her former employer, Defendant Corrections Corporation of America d/b/a Tallahatchie County Correctional Facility.[1] Before the Court are Plaintiff's motion to continue [81], Defendant's[2] motion for summary judgment [56], Defendant's motion for leave to file a reply in support of its motion for summary judgment [67], and Defendant's four motions in limine [69, 71, 73, 75]. For the reasons that follow, the motion for summary judgment is granted, and the motions for leave, in limine, and to continue are denied as moot.

**I
Motion for Leave to File Reply**

Defendant filed its motion for summary judgment on June 2, 2014. Doc. #56. On June 16, 2014, Plaintiff filed a motion to extend the time to file a response to the motion for summary

---

[1] Although the complaint names Corrections Corporation of America and Tallahatchie County Correctional Facility as separate defendants, Corrections Corporation of America represents, and Plaintiff does not dispute, that TCCF is a trade name for CCA. Doc. #1 at ¶ 8. Accordingly, this opinion will treat CCA and TCCF as a single entity.

[2] Four individual defendants (Bobbie Philips, "J. Wardlow," Charlotte Burns, Miranda Rankin, and Gina Robinson) were previously dismissed by joint stipulation. Doc. #62.

judgment from June 19, 2014, through and until July 3, 2014. Doc. #60. On June 19, 2014, Plaintiff filed her response to the motion for summary judgment. Doc. #64. Because Plaintiff filed her response within the time allowed, the Court denied her motion for extension as moot. Doc. #66.

On July 16, 2014, Defendant filed a motion for leave to file a reply out of time. Doc. #67. The proposed reply was attached as an exhibit to the motion. Doc. #67-1. In its motion, Defendant submits that "the undersigned counsel responsible for drafting and filing of the reply brief was hospitalized unexpectedly shortly prior to the deadline and has been unable [to] file the reply memorandum since being discharged." Doc. #67. Plaintiff opposes the motion on the grounds that "[a]n associate counsel could have and should have filed [the reply]" and "[s]uch a delay may not be excused as a mistake or unintentional oversight." Doc. #68.

Upon consideration, the Court concludes that the summary judgment motion may be decided without recourse to a reply brief. Accordingly, because the summary judgment motion is granted below, the motion for leave will be denied as moot.

## II
## Motion for Summary Judgment Standard

"Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law." *Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'ship*, 520 F.3d 409, 411 (5th Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). To award summary judgment, "[a] court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Id.* at 411–12 (internal quotation marks omitted). To this end,

"[t]he moving party bears the burden of establishing that there are no genuine issues of material fact." *Id*. at 412.

"If, as here, the nonmoving party bears the burden of proof at trial, the moving party may demonstrate that it is entitled to summary judgment by submitting affidavits or other similar evidence negating the nonmoving party's claim, or by pointing out to the district court the absence of evidence necessary to support the nonmoving party's case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998). If the moving party makes the necessary demonstration, "the burden shifts to the nonmoving party to show that summary judgment is inappropriate." *Id.* In making this showing, "the nonmoving party must go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Cotroneo v. Shaw Env't & Infrastructure, Inc.*, 639 F.3d 186, 191–92 (5th Cir. 2011) (internal punctuation omitted). When considering a motion for summary judgment, the Court "resolve[s] factual controversies in favor of the nonmoving party." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

**III**
**Relevant Facts**

On June 12, 2008, Plaintiff Jackie Scott submitted an application for employment to work as an "Academic Instructor" at the Tallahatchie County Correctional Facility ("TCCF") run by Defendant Corrections Corporation of America ("CCA"). Doc. #56-3. On the last page of the employment application, Plaintiff checked a box acknowledging her understanding and agreement to the statement that "any employment with [Defendant] is for an indefinite term and can be terminated, with or without cause, at any time at the discretion of either the company or myself." *Id.* Plaintiff began work with Defendant on August 4, 2008. Doc. #56-4.

On August 4, 2008, Plaintiff executed a CCA Code of Conduct Acknowledgment Form in which she acknowledged receiving and reading CCA's Code of Conduct. Doc. #56-2. Of relevance here, page two of the Code of Conduct listed "Integrity," "Respect," "Trust" and "Loyalty" as "Guiding Principles." *Id*. The Code of Conduct also provided that "[a]ny employee who violates the Code of Conduct is subject to disciplinary or corrective action ranging from warnings and reprimands up to and including termination of employment …." *Id*.

On August 25, 2008, Plaintiff executed an Acceptance form re-affirming her status as an at-will employee. Doc. #56-4.

### A. Plaintiff's Disciplinary History

During Plaintiff's employment, she worked two class shifts: a morning shift from approximately 7:00 a.m. until 11:30 a.m.; and an afternoon shift from approximately 1:00 p.m. until "4:00 … or 5:00 … or whatever time the inmates would be released from the education building back to their units." Doc. #56-1 at 165–66.

On May 12, 2009, Plaintiff received a "Letter of Instruction" from Gina Robinson, Instructional Supervisor, or "Principal," at TCCF. Doc. #56-5. The letter provided, in relevant part:

> According to Policy every employee is required to call their direct supervisor two hours prior to their assigned shift, or as soon as possible if they are not able to report to work.
>
> On Monday, May 4, 2009 you were scheduled to report to your post by 7:00 a.m. You signed in on the Education Roster at 7:04a.m. On May 12, 2009 you arrived in Education at 7:12 and signed in at 7:00 No call is on record as missed to the Instructor Supervisor, Principal, or the facility. For future reference you are advised to call the Instructor Supervisor, Principal, or the facility in this order. As your supervisor, I encourage you to take corrective action. Your failure to do so could result in a formal review by the Administration.

*Id*.

When presented with the May 12 letter, Plaintiff informed Robinson that she previously asked her former supervisor, "Mr. Reaves,"[3] for permission to arrive "a few minutes" late, and that Reaves approved the request. Doc. #56-1 at 118. Based on her previous agreement with Reaves, Plaintiff refused to sign the letter of instruction. *Id*. at 121.

On May 13, 2009, Robinson issued Plaintiff an Employee Problem Solving Notice ("PSN"). Doc. #56-6. The PSN recommended that Plaintiff be issued a written reprimand for signing into work at 7:05 a.m., five minutes after the time she was scheduled to work. *Id*. The notice also asserted that Plaintiff "had a counseling session earlier this week regarding a problem with this issue." *Id*. On June 9, 2009, Dwayne Blair, acting as "Warden/Administrator/FSC Department Head," followed Robinson's suggestion and issued Plaintiff a written reprimand. *Id*.

On June 16, 2010, Robinson issued Plaintiff a second PSN recommending a second written reprimand. Doc. #56-7. As grounds for the reprimand, the June 16 PSN recited:

> On Wednesday at 7:15a.m. June 16, 2010 Instructor Supervisor, G. Robinson discussed use of PTO [paid time off] with J. Scott. She was advised to complete a PTO slip for 4 hours yesterday and was approved to leave at 11:00 a.m. Mrs. Scott stated she stayed until 13:00 (against request of supervisor) and needed to leave again at 13:00 on June 17. Mrs. Scott refused to complete the slip and stated. "She would just have to talk to me about this later." Mrs. Scott abuses leaving early without submitting PTO as requested. She assumes her need to leave early should always be approved if she has worked a 5 hour shift. Every time Mrs. Scott leaves early she causes a class cancellation. She has left early every week on the following dates in the last six weeks by her request.
>
> May 5 out early
> May 12 out early
> May 19 out early
> June 2 out early
> June 10 -left early 4 hours PTO
> June 15- left early, requested 4 hours of PTO, refused to submit,
> June 16- Leaving early- refused to submit PTO.
>
> Mrs. Scott has violated policy 3-3 Code of Conduct, Diligence & Insubordination.

---

[3] Reaves, whose first name is not apparent from the record, previously occupied Robinson's position. Doc. #56-1 at 118.

5

Doc. #56-7. Based on this PSN, Assistant Warden Charlotte Burns issued Plaintiff a written reprimand. *Id.*

Plaintiff explained that, at the time of the second PSN, "[t]he policy was, if you work four hours or more in a given day, you don't have to take leave time." Doc. #56-1 at 164–65. Plaintiff also testified that it was "customary" for instructors to cancel their afternoon class and to work until 1:00 p.m., thus avoiding a forced use of PTO. *Id.* at 168–69.

On June 20, 2010, Plaintiff initiated a "Case" with Global Compliance, Defendant's internal complaint hotline. Doc. #56-8; Doc. #56-1 at 182. Plaintiff informed Global Compliance that during the meeting regarding the June 16 PSN, Burns "accused [Plaintiff] of stealing time [and] spoke to [Plaintiff] in a rude and disrespectful manner and made [Plaintiff] cry." Doc. #56-8. The Global Compliance record reflects that Plaintiff accused Burns of violating company policy, but "did not know the name or details of the policy [Burns] violated." *Id.* The record lists Robinson and Bobby Phillips as "Other Involved Part[ies]." *Id.*

Two days later, on June 22, 2010, Plaintiff placed a follow-up call with Global Compliance. Doc. #56-8. During the follow-up call, Plaintiff inquired about the status of her case, and explained that "she discussed the issue with Warden Phillips and he said she should discuss it further with [Robinson and Burns]. [S]he felt she was getting nowhere so she has filed a grievance against Asst. Warden Burns and Gina Robinson." *Id.* Plaintiff's case was closed the day of her follow-up call. *Id.*

The same day, Plaintiff filed an Employee Grievance against Robinson and Burns. Doc. #56-9. In this grievance, Plaintiff wrote:

> I am writing this grievance because I feel that my integrity and professionalism are being questioned. I was falsely accused of abusing time and disobeying a directive. I was given a written reprimand for these accusations on June 16th by

6

> Warden Burns. On June 14th I was approved by Ms. Gina Robinson to leave early on June 15th to pick up my new eyeglass lens in Oxford, MS. I worked until 1300 hours on the 15th[,] checked my e-mail and made copies for the next day. On Wednesday morning, June 16th, after arriving to work and signing in, Ms. Robinson asked me to complete a PTO slip for 4 hours from June 15th. I advised her that I had worked until 1300 hours the previous day and questioned her regarding the need for a PTO slip. She replied that she had advised me to leave at 11:00 instead of 1300 hours. Some other staff left with me on the 15th, Joanna Smith and Ebony Scott. How could I be accused of abusing time when I had used 12 hours of PTO the previous week on the 8th for my annual eye exam and the 10th for an emergency tooth filling. I feel that I am being denied the ability to leave early whenever necessary, while others are being approved without being harassed. (additional page attached)[4]

Doc. #56-9 (footnote added).

On July 28, 2010, Robinson issued Plaintiff a PSN for violation of the "policy 3-3, Code of Conduct." Doc. #56-10. The PSN charged Plaintiff with falsifying her attendance three days. *Id.* Specifically, the document alleged that: (1) on July 23, 2010, Plaintiff arrived at 7:20 a.m. and signed in as if she arrived at 7:05 a.m.; (2) on July 26, 2010, Plaintiff "arrived late and signed in at 7:05;" and (3) on July 27, 2010, Plaintiff arrived at 7:13 a.m. and signed in as if she arrived at 7:00 a.m. *Id.* Based on the alleged conduct, Robinson recommended a written reprimand. *Id.*

On August 19, 2010, Investigator S.E. Brady sent Phillips a memorandum stating that a review of security footage revealed that: (1) on July 23 and July 27, Plaintiff arrived to work at 7:11 a.m. and signed in as having arrived at 7:05 a.m.; and (2) on July 26, arrived to work at 7:13 a.m. and signed in as having arrived at 7:05 a.m. Doc. #56-11. As punishment for the alleged infraction, Phillips suspended Plaintiff without pay for the August 20, 2010, workday. Doc. #56-10.

---

[4] Although the grievance form purports to include additional pages, the exhibit submitted by Defendant is just one page.

On March 1, 2011, Miranda Rankin, Defendant's new Principal,[5] issued Plaintiff a PSN for violation of "3-3-C Code of Conduct." Doc. #56-12. The PSN charged that:

> On the date listed … at approximately 830 am in Room B115 INEA during education [Plaintiff] was loudly cursing and arguing with another instructor. [Plaintiff] has violated 3-3 Code of Conduct and failed to conduct herself as a professional. As [Plaintiff's] supervisor her integrity is being questioned due to her 51-C statement and lack of support from a room full of witnesses during this incident.

*Id.* Rankin recommended a written reprimand as punishment for the alleged infraction. *Id.*

On March 10, 2011, before Defendant's administration levied discipline for the March 1 PSN, Rankin issued Plaintiff another PSN for violation of "3-3-C Code of Conduct Diligence." Doc. #56-13. In the March 10 PSN, Rankin alleged that on the day of the PSN, Plaintiff "was late for work [and] did not notify her first or second line to work. She arrived to work at 7:20am and signed in for 7:05 am. This act lacks integrity as a professional." *Id.* As punishment for this infraction, Rankin recommended that Plaintiff's employment be terminated. *Id.*

Plaintiff was terminated on April 7, 2011. Doc. #56-14. Plaintiff's termination report reflects that she was terminated for "Violation of company rule or policy" and for having falsified records. *Id.* The termination was approved by Jerry Wardlow, as "Warden/Administrator/FSC Department Head." Doc. #56-13.

**B. Procedural History**

On April 2, 2012, Plaintiff filed a complaint against CCA and TCCF in the Second District of the Circuit Court of Tallahatchie County, Mississippi. Doc. #2. Plaintiff's complaint alleged that: (1) she was disciplined for conduct "tolerated from others and on a regular basis;" (2) she was "denied the privilege of occasionally taking necessary leave without using personal leave time after working at least five hours on … that specific day, according to the policy titled

---
[5] At an unknown point between July 2010 and March 2011, Miranda Rankin replaced Robinson as Principal. Doc. #56-12.

Paid Time Off, Policy Number 3-5-2;" (3) she "was harassed and subsequently fired and the other employees who were the aggressors were not in the least held accountable;" (4) her "PSN process was violated wh[en she] was not given a timely and fair hearing process;" and (5) because her "immediate supervisor and the Facility Warden were dating, [she] did not have a fair chance of a grievance." *Id.*

For reasons not revealed, Defendant was not served with process until May 30, 2013. Doc. #1-2. On June 28, 2013, Defendant removed the action to this Court on the grounds of diversity jurisdiction. Doc. #1.

On August 16, 2013, Plaintiff filed an Equal Employment Opportunity Commission ("EEOC") Charge of Discrimination against TCCF. Doc. #56-15. In her charge, Plaintiff alleged discrimination based on race and retaliation. *Id.* Under "particulars," Plaintiff wrote:

> I started working with the above named company around August 4, 2008. I was discharged April 7, 2011.
>
> I made numerous … complaints on my employer during the relevant period. I was retaliated against and discharge[d] as a result. I was told by management on April 7, 2011, I am being discharged for falsifying documents, stealing time, which I deny, also for fighting and arguing with another employee.
>
> I believe I have been discriminated against and discharge[d] because of my race (Black), and in retaliation for filing complaints, in violation of Title VII of the Civil Rights Act of 1964, as amended.

Doc. #56-15.

On February 20, 2014, with leave of this Court, Plaintiff filed an amended complaint in which she alleges claims for: (1) violation of her First Amendment rights; (2) violation of her due process rights; (3) "hostile work environment;" and (4) "retaliation." Doc. #30.

On June 2, 2014, Defendant filed the instant motion for summary judgment in which it seeks dismissal of all claims. Doc. #56.

9

# IV
# Analysis

In its motion for summary judgment, Defendant argues that: (1) the hostile work environment and retaliation claims must fail because Plaintiff failed to timely exhaust her remedies and because Plaintiff cannot prove the elements of either claim; (2) Plaintiff cannot state a First Amendment claim; and (3) Plaintiff cannot state a claim for violation of her due process rights. Doc. #57.

### A. Hostile Work Environment and Retaliation

In its motion for summary judgment, Defendant submits that, insofar as Plaintiff has raised claims for hostile work environment and retaliation under Title VII of the Civil Rights Act, such claims must fail because they were not exhausted. Doc. #57 at 7–9. "Title VII prohibits an employer from discriminating 'against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Nasti v. CIBA Specialty Chems. Corp.*, 492 F.3d 589, 593 (5th Cir. 2011) (quoting 42 U.S.C. § 2000e–2(a)(1)). "Title VII requires employees to exhaust their administrative remedies before seeking judicial relief." *McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 273 (5th Cir. 2008). "Exhaustion occurs when the plaintiff files a timely charge with the EEOC and receives a statutory notice of right to sue." *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 379 (5th Cir. 2002) (internal citation omitted). In this regard, a charge of discrimination must be filed within 180 days of the unlawful act. 42 U.S.C. § 2000e-5(e)(1).

Here, it is undisputed that Plaintiff did not file a charge of discrimination with the EEOC until August 16, 2013, more than 850 days after April 7, 2011 – the date of the last alleged wrongful act. Nevertheless, in her response to the motion for summary judgment, Plaintiff

argues that "[a] few weeks after termination by CCA … Plaintiff phoned the EEOC office and advised them of her situation."[6]  Doc. #64 at 1.  However, EEOC regulations explicitly require that a "charge … be in writing and signed …."  29 C.F.R. § 1601.9.  Because Plaintiff failed to file a writing with the EEOC, she failed to file a "charge" within the meaning of the statute.  *Id*.  Accordingly, she failed to exhaust her claims under Title VII, and her retaliation and hostile work environment claims must fail insofar as they are asserted through Title VII.  *McClain*, 519 F.3d at 273.

Notwithstanding the failure to exhaust her Title VII claims, to the extent Plaintiff asserts her retaliation and hostile work environment claims as violations of 42 U.S.C. § 1981, exhaustion of such claims would not be required.  *See Wagner v. Boh Bros. Constr. Co., LLC*, No. 11-2030, 2012 WL 2576285, at *1 (E.D. La. Jul. 3, 2012) ('Section 1981 claims are governed by the same standards as Title VII, except that Section 1981 does not require exhaustion of administrative remedies.") (collecting cases).  "Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship."  *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006).  Nevertheless, even if her complaint, which did not mention section 1981 in any context, could be deemed as raising such claims, summary judgment would still be appropriate.  *See Smith v. K & G Clothing Store*, No. 13-5737, 2014 458073, at *2 (E.D. La. Feb. 4, 2014) ("A *pro se* complaint 'must be read liberally and should be interpreted to raise the strongest arguments that they suggest.'") (quoting *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996)).

---

[6] Plaintiff also argues that her filing of this action obviated the need to file an EEOC charge.  This argument is summarily rejected.  *See McClain*, 519 F.3d at 273 ("Title VII requires employees to exhaust their administrative remedies <u>before</u> seeking judicial relief.") (emphasis added).

### 1. Retaliation Under Section 1981

Section 1981 encompasses claims of retaliation. *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 451 (2008). Where, as here, a plaintiff is unable to present direct evidence of retaliation, "[r]etaliation claims under … § 1981 are analyzed under the *McDonnell Douglas* burden-shifting scheme." *Mayberry v. Mudny Contract Maint. Inc.*, 197 Fed. App'x 314, 317 (5th Cir. 2006). Under this framework, a plaintiff must first establish a prima facie case of retaliation. *Id.* If the plaintiff discharges her burden, the defendant must offer a legitimate non-retaliatory reason for the allegedly retaliatory action. *Id.* Finally, if the defendant offers a legitimate reason for the action, the plaintiff must show that the stated reason is pretextual. *Id.*

"To establish a [prima facie] claim for retaliation under … § 1981, a plaintiff must demonstrate that (1) he engaged in a protected activity, (2) the employer took an adverse employment action against him, and (3) there was a causal connection between the protected activity and the adverse action." *Mayberry*, 197 Fed. App'x at 317 (citing *Mota v. Univ. of Tex. Houston Health Sci. Ctr.*, 261 F.3d 512, 519 (5th Cir. 2001)) (internal quotation marks omitted). "At a minimum, courts agree that an act of retaliation for engaging in activity protected by Title VII does not give rise to a claim for retaliation that is cognizable under § 1981 unless that activity was also protected by § 1981." *Floyd v. Amite Cnty. Sch. Dist.*, 3:04-cv-78, 2008 WL 2954972, at *4–5 (S.D. Miss. Jul. 29, 2008) (internal quotation marks and emphasis omitted) (quoting *Welzel v. Bernstein*, 436 F. Supp. 2d 110, 118–19 (D. D.C. 2006)). "Thus, to satisfy the first prong of a prima facie case for retaliation under § 1981, plaintiff must demonstrate with some particularity that she attempted to vindicate the rights that are implicated by § 1981." *Welzel*, 436 F.Supp. 2d at 118. Put differently, "she must – at a minimum – establish that the opposition for which she suffered an adverse employment action pertained to racial

12

discrimination." *Cartwright v. Tacala, Inc.*, No. 99-W-663, 2000 WL 33287445, at *10 (M.D. Ala. Nov. 1, 2000); *see also Floyd*, 2008 WL 2954972, at *5 ("What Floyd would claim as the 'protected activity' in which he engaged is having invited white students from the local private school to use the track facilities at ACHS. However, as this is not a claim that Floyd attempted to vindicate any right of these white students to be free from racial discrimination in the making and enforcement of any contract, Floyd cannot make out a cognizable § 1981 retaliation claim.").

Here, neither Plaintiff's written grievance nor her call to Global Compliance (the only two arguably relevant activities) complained of racial discrimination. Thus, neither act may be deemed an attempt to vindicate a right guaranteed by section 1981. Accordingly, any claim for retaliation under section 1981 must fail. *See Cartwright*, 2000 WL 33287445, at *10 (granting summary judgment against section 1981 retaliation claim where the evidence did "not create a genuine issue of fact regarding whether plaintiff complained … that … conduct in altering employees' hours was racially discriminatory"); *see also Washington v. M. Hanna Constr. Inc.*, 299 Fed. App'x 399, 401–02 (5th Cir. 2008) ("[V]ague allegations regarding complaints … none of which are facially directed at the enforcement of rights protected by Title VII, are insufficient to state a retaliation claim ….").

### 2. Hostile Work Environment Under Section 1981

To prevail on a claim for hostile work environment under section 1981, a plaintiff must show: "(1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) <u>the harassment complained of was based on race</u>; (4) the harassment complained of affected a term, condition, or privilege of employment; (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action." *Corley v. Louisiana ex rel. Div. of Admin., Office of Risk Mgmt.*, 498 Fed. App'x 448, 450 (5th Cir. 2012) (quoting *Ramsey*

*v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)) (emphasis added). Under this standard, a plaintiff cannot prevail where she "present[s] numerous acts showing hostility between her and her coworkers [but] fail[s] to show that this hostility was related to race." *Id.*

Here, Defendant argues that Plaintiff's hostile work environment claim must fail because there is no indication the alleged harassment was based on race. Doc. #57 at 16. The Court agrees.

The record reflects that Plaintiff was disciplined, sometimes harshly, for alleged infractions related to attendance, and that she was subjected to unequal application of Defendant's PTO policy. Even if this treatment could rise to the level of a hostile work environment, there is absolutely no evidence the allegedly harassing acts were motivated by racial animus. In the absence of such evidence, summary judgment against the racial harassment claim is required. *See Watkins v. Texas Dep't of Criminal Justice*, No. H-03-5698, 2006 WL 1581833, at *10 (S.D. Tex. June 6, 2010) ("Viewing the uncontroverted summary judgment evidence in the light most favorable to Plaintiff, Plaintiff has failed to adduce evidence that any of the alleged harassing events were based on race or had a racial character or purpose.") (collecting cases).

### B. First Amendment

"[A] First Amendment retaliation claim in the employment context has four elements: (1) the plaintiff suffered an adverse employment decision, (2) the plaintiff's speech involved a matter of public concern, (3) the plaintiff's interest in speaking outweighed the governmental defendant's interest in promoting efficiency, and (4) the protected speech motivated the defendant's conduct." *Kinney v. Weaver*, 367 F.3d 337, 356 (5th Cir. 2004). During her deposition, Plaintiff explained that she felt that her First Amendment rights were violated by

14

Robinson and Burns issuing her disciplinary notices because she engaged in protected speech when she filed her grievances against the two women. Doc. #56-1 at 244–45. Defendant argues that Plaintiff's grievances were not protected speech so as to trigger a First Amendment claim. Doc. #57 at 14–15.

In her response brief, Plaintiff argues that she engaged in speech on a matter of public concern when she attended a September 3, 2010, public meeting on the working conditions at TCCF and "spoke … regarding matters such as the unsafe, deplorable working conditions, and the Laze Fair [sic] style of management at the facility." Doc. #64 at 5. As support for this statement, Plaintiff attached a scanned copy of an article titled "Complaint Filed with NAACP over local prison" from an undated section of *The Sun-Sentinel*, a newspaper from Tallahatchie County. Doc. #64 at Ex. R. Although the article recites that there was a "gathering [regarding conditions at TCCF] of about 50 people at the Emmett Till Multi-Purpose Complex," Plaintiff is not identified as an attendee, much less a speaker, at the event. *Id.* Accordingly, even if the article could be deemed admissible,[7] it does not create a genuine issue of material fact as to whether she spoke on a matter of public concern.

As to Plaintiff's internal complaints, "[w]hile speech pertaining to internal personnel disputes and working conditions ordinarily will not involve public concern, speech complaining of misconduct within [a public entity] is speech addressing a matter of public concern." *Alexander v. Eeds*, 392 F.3d 138, 142 (5th Cir. 2004) (internal punctuation and quotation marks omitted). In attempting to draw this type of distinction, a court should consider whether complaints: (1) "were essentially private, not public in nature;" (2) "were voiced only in the form of questions regarding [specific application of policy], not about general promotion policy;" (3)

---

[7] "Generally newspaper articles are inadmissible hearsay." *Reynolds v. City of Poteet*, No. 12-cv-1112, 2014 WL 1355560, at *7 (W.D. Tex. Apr. 4, 2014) (collecting cases).

"were … leaked to a reporter or sent to an elected state official;" (4) "were made against a backdrop of widespread debate in the community or could make valuable contributions to public debate." *Id.* at 143 (internal quotation marks omitted).

First, Plaintiff's internal complaints concerned Defendant's application of its policies to Plaintiff herself. The complaints were private and not leaked to a reporter or an elected state official. Finally, given that the complaints were private and occurred approximately a year before any mention of public debate on Defendant's treatment of its employees, the Court cannot conclude that Plaintiff's speech was made against a backdrop of widespread debate, or could have made a valuable contribution to public debate. Under these circumstances, the Court concludes that Plaintiff did not speak on a matter of public concern, and that, therefore, her First Amendment retaliation claim must fail.[8]

### C. Due Process

Finally, Plaintiff brings a claim styled as an "at will" action in which she asserts that:

> Defendant has promulgated a[n employment at will policy] that clearly violated Plaintiff's constitutional right. As a [U]nited [S]tate[s] citizen under the modification of the Fourteenth Amendment, Plaintiff has been given life, liberty, and … property rights relative to the Fourteenth Amendment. Plaintiff's employment is her property that the defendant took away without a due process hearing.

Doc. #30 at 2. The Court interprets this cause of action as a claim for violation of Plaintiff's due process rights.

"To show a due process violation in the public employment context, the plaintiff must first show that she had a legally recognized property interest at stake." *Lollar v. Baker*, 196 F.3d 603, 607 (5th Cir. 1999). "A public employee has a property interest in her job if she has a

---

[8] In her response to the motion for summary judgment, Plaintiff also argues that summary judgment against her First Amendment claim is inappropriate because Defendant's policy of at-will employment violated her right to due process. Doc. #64 at 4. This contention is addressed below.

16

legitimate claim of entitlement to it, a claim which would limit the employer's ability to terminate the employment." *Johnson v. Sw. Miss. Reg'l Med. Ctr.*, 878 F.2d 856, 858 (5th Cir. 1989). Of relevance here, because "[a]t will employees have no constitutionally protected property interest in employment," an at will employee may not pursue a due process claim based on an allegedly wrongful termination. *Stark v. Univ. of S. Miss.*, __ F. Supp. 2d __, No. 2:13-cv-31, 2014 WL 1235346, at *11 (S.D. Miss. Mar. 25, 2014).

"Mississippi adheres to the common law doctrine of employment-at-will." *Senseney v. Miss. Power Co.*, 914 So. 2d 1225, 1228 (Miss. Ct. App. 2005). "This common-law doctrine provides that, in the absence of an employment contract or where the contract does not specify the term of the employment, either party may terminate the employment relationship at-will." *Starks v. City of Fayette*, 911 So. 2d 1030, 1032 (Miss. Ct. App. 2005) (citing *Perry v. Sears, Roebuck & Co.*, 508 So. 2d 1086, 1088 (Miss. 1987)). Notwithstanding this, an employer's conduct may modify the employment contract in such a way as to abrogate the at-will rule. *Bobbitt v. Orchard, Ltd.*, 603 So. 2d 356, 361 (Miss. 1992).

Defendant argues that Plaintiff was an at-will employee because she lacked a contract specifying a specific term of employment and that, therefore, she may not maintain a due process action. Plaintiff responds that the at-will rule was abrogated by her belief that she applied for a "permanent" position and by Defendant's failure to clearly explain the meaning of "at-will" employment.[9]

---

[9] More specifically, Plaintiff claims that she was not an at will employee because: (1) she applied for a "permanent position" and "[i]f a position can be terminated without cause it is not a permanent position;" (2) at the time of her hiring "it was not explained by the recruiter HR that [Plaintiff] could be terminated without cause;" (3) "[i]t is general practice in employment that jobs are permanent and one can only be terminated without [sic] cause;" (4) a position may not be deemed at will unless "[t]he employee [had] a clear understanding in a contractual agreement that he or she could be terminated without cause." Doc. #64 at 7–8.

As an initial matter, it is beyond dispute that Plaintiff did not have an employment contract for a specific term. Accordingly, Plaintiff's employment was at-will unless Defendant's conduct "create[d] a contractual obligation that would tend to override the at-will doctrine." *Byrd v. Imperial Palace of Miss.*, 807 So. 2d 433, 438 (Miss. 2001); *see also Slatery v. Ne. Mississippi Contract Procurement, Inc.*, 747 So. 2d 257, 259 (Miss. 1999) ("In *Bobbitt,* [the] Court held that where an employer published and distributed a handbook to all employees, the employer … created a <u>contractual obligation</u> to follow the policies and procedures outlined in the handbook …." (emphasis added)).

It is axiomatic that "[t]he most basic elements of an enforceable contract are an offer and an acceptance." *McGhee v. Young*, 138 So. 3d 259, 262 (Miss. 2014). Accordingly, it follows that, for an employer's conduct to be deemed to alter the at-will rule, such conduct must amount to an offer to create such a modification, and must be supported by consideration. *See Glasgow v. Sherwin-Williams Co.*, 901 F.Supp. 1185, 1191 (N.D. Miss. 1995) ("The only way that [a letter] could alter that employment relationship … is if it were supported by a valuable consideration outside the services which [Glasgow] renders from day to day.") (internal punctuation omitted). "For an offer to be valid under Mississippi law, it must be clear, definite, and complete." *Morris v. Liberty Mut. Ins. Co.*, 659 F.Supp. 201, 204 (N.D. Miss. 1987) (citing *Williams v. Favret*, 161 F.2d 822, 824 (5th Cir. 1947)).

Here, Plaintiff has failed to point to any conduct on the part of the Defendant which could be deemed an offer to alter her at-will employment. To the contrary, Defendant required that applicants for Plaintiff's position acknowledge that: "I understand that any employment with [CCA] is for an indefinite term and can be terminated, with or without cause, at any time at the discretion of either the company or myself." Doc. #56-3 at 4. Furthermore, when Plaintiff was

hired she was provided (and subsequently signed) a form acknowledging that: "I understand that … CCA is an employment-at-will company [and] my employment with [CCA] can be terminated, with or without cause, at any time at the discretion of either the company or myself." Doc. #56-4. Thus, contrary to Plaintiff's contentions, she applied for an at-will position and accepted the position after being explicitly informed that she could be terminated without cause. Under these circumstances, the Court concludes that Plaintiff was an at-will employee and that her due process claim must fail.[10] *Stark*, 2014 WL 1235346, at *11.

## IV
## Conclusion

For the reasons above, Defendant's motion for summary judgment [56] is **GRANTED**. Furthermore, the following motions are denied as moot: (1) Defendant's motion for leave to file its reply brief out of time [67]; (2) Defendant's first motion in limine [69]; (3) Defendant's second motion in limine [71]; (4) Defendant's third motion in limine [73]; (5) Defendant's fourth motion in limine; and (6) Plaintiff's motion for continuance [81].

SO ORDERED, this the 7th day of October, 2014.

/s/ Debra M. Brown
**UNITED STATES DISTRICT JUDGE**

---

[10] Having found that all of Plaintiff's claims must fail, the court will deny as moot the motion to continue [81] and the pending motions in limine [69, 71, 73, 75].